**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HOWARD GREILS and HOWARD GREILS, M.D., INC.,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| | **NO.  15-5224** |
| **LINCOLN NATIONAL LIFE INSURANCE COMPANY,** | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Howard Greils and Howard Greils, M.D., Inc., contend that, by taking certain actions as the insurers of life insurance policies which were devalued through a larger, complex scheme to swindle funds from welfare benefit plans operated by one John Koresko, Defendant Lincoln National Life Insurance Company ("Lincoln") violated two sections of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2)-(3) and two sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d).  Plaintiffs also assert the following common law claims against Defendant: fraud, breach of fiduciary duty, knowing participation in and aiding and abetting breach of fiduciary duty, breach of an obligation of good faith, and negligence.

Plaintiffs now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on their ERISA claims, and Defendant cross-moves for summary judgment on all of Plaintiffs' claims.  For the reasons that follow, Plaintiffs' Motion shall be denied, and Defendant's Motion shall be granted in part and denied in part.

**I.    BACKGROUND**

This story arises from a complex scheme run by John Koresko and his affiliates to steal

tens of millions of dollars from hundreds of welfare benefit plans.  In the decade of litigation following the discovery of this scheme, the focus of these suits has shifted from Koresko to the insurers which provided life insurance policies used in the welfare benefit plans.  Plaintiffs are some of Koresko's victims and contend that Defendant was in on Koresko's scheme.  Specifically, Plaintiffs allege that Defendant was an ERISA fiduciary because it exercised undirected control by issuing a loan on a life insurance policy on Plaintiffs Howard Greils' life, and by changing the owner of said Policy.  Plaintiffs also argue that Defendant was part of a RICO enterprise with Koresko and his cohorts and committed various violations of state common law.

To follow the narrative, one must be familiar with the myriad characters involved and the roles they played.  Plaintiff Howard Greils is a psychiatrist who owns and practices medicine through Plaintiff Howard Greils, M.D. Inc ("HG").  He is a participant in and fiduciary of the Howard Greils, M.D., Inc., Welfare Benefit Plan ("HG Plan").  In the 1990s, Greils was seeking to procure life insurance on a tax-deductible basis.  On the advice of his financial and insurance advisor, Richard Yacko, he joined Koresko's arrangement in December 1999.

Much of the work in running the HG Plan and other plans was done by John Koresko who established several entities which he used to perpetuate his fraud.  These entities included the Regional Employers' Assurance Leagues ("REAL")—a loose, unincorporated association of unrelated employers through which Koresko offered to employers his program of employee welfare benefit plans and benefits.  Koresko also established two trusts, the Regional Employers Assurance League Voluntary Employees' Beneficiary Association Trust ("REAL VEBA Trust") and the Single Employer Welfare Benefit Plan Trust ("Single Employer Trust").  Three different entities, First Union National Bank ("FUNB"), Community Trust Company ("CTC"), Farmers &

Merchants Trust Company ("F&M") and Penn Public Trust ("PPT"), served as the two Trusts'
trustees in that order.  The last of these trustees, PPT, was established and owned by Koresko.
Koresko also founded, owned and served as the director of PennMont Benefits Services, Inc.
("Penn-Mont"), which served as the administrator for each employer's plan, including the HG
Plan.  Finally, Koresko founded and wholly owned two law firms—the Koresko Law Firm and
Koresko & Associates, P.C.—which represented and acted on behalf of the other Koresko
entities.

       To join the arrangement, Howard Greils and HG executed several interrelated
documents,[1] which consolidated power into the hands of John Koresko and his affiliates,
including Penn-Mont and the trustee of the REAL VEBA and Single Employer Trusts.  These
documents established and named Plaintiffs' welfare benefit plan—the HG Plan— and
referenced certain entities and persons involved in the management of the plan and the Koresko
arrangement.  They named Koresko a fiduciary of the HG Plan, authorized him to complete any
documents on behalf of Greils which Penn-Mont determined to be incident to the HG Plan, and
provided that his signature alone could direct the Trustee to act in matters related to the trusts
and the HG Plan.  These documents similarly authorized Penn-Mont to: (1) complete and
execute any documents on behalf of Greils which it determined were related to the HG Plan; (2)
instruct the Trustee to act on behalf of the trusts and the HG Plan; and, (3) exercise its sole
discretion to delegate any and all fiduciary responsibilities under the Trusts.  The Trustee, which
was CTC at the time of execution, could take all manner of action on behalf of the Trusts at the
direction of Penn-Mont, or Koresko.  Koresko and Penn-Mont thus held all the authority to act

---

[1] These documents included: (1) an "Adoption Agreement"; (2) the "REAL VEBA Health and Welfare Plan
Document"—a prototype plan document created by Koresko; (3) a "Master Trust Agreement"; and, (4) an
"Employee Participation Agreement."

on behalf of the HG Plan and the Trusts and on behalf of Greils with respect to matters pertaining to the HG Plan.  Further they could direct the trustee to exercise its powers to do their bidding.

Once the HG Plan was established, life insurance policies were taken on the lives of plan participants though the trustee—then FUNB.  The Trust functioned as a pass-through vehicle, receiving insurance premiums paid by the employer and paying them to the insurance company for the policies.  In this case, at Greils' request, a written application was submitted on behalf of the HG Plan to Jefferson-Pilot Life Insurance Company ("Jefferson") for a $2.5 million life insurance policy on Greils' life (the "Policy" or the "Greils Policy").  The application listed the owner and beneficiary for the Policy as the "First Union National Bank, NA, Trustee f/b/o Howrd Greils, MD, Inc., WBP" and its address as a King of Prussia P.O. Box left to the care of Penn-Mont.  The application also did not specify the role or relationship of Penn-Mont to the Policy or to FUNB.  Jefferson issued the policy in late March 2000.  In 2006, Defendant Lincoln merged with Jefferson; Lincoln succeeded Jefferson following the merger.

Aside from John Koresko and his companies, his brother, Lawrence Koresko,[2] was also key to this arrangement.  Lawrence Koresko was the Vice President and part-owner of Penn-Mont and worked *inter alia* as an independent insurance broker at Koresko Financial, an insurance wholesaler he founded and jointly owned with his brother John.

The final character in this story is the Department of Labor, which as mentioned *supra* sued the REAL VEBA Trust, the Single Employer Trust, Koresko, CTC, Koresko's law firms and Koresko's employees for violating ERISA by misusing funds from hundreds of welfare benefit plans.  Ultimately, in February 2015, the Department of Labor prevailed in its lawsuit

---

[2] Unless otherwise noted, "Koresko" as used in this opinion refers only to John Koresko.

against Koresko and the other defendants in the action—who were determined to be ERISA fiduciaries of the employers' plans and found to have violated various provisions of the law by misusing plan funds, including by taking out loans exceeding $35 million on insurance policies.[3] As relevant here, a loan in the amount of $784,848.61 was issued by Lincoln on the Policy, a portion of which has been repaid. The remainder of the loan balance has continued to accrue interest in the 13 years since it was issued.

These characters, or the "who," are not the only piece to solving the puzzle of the case; the "what" and the "when" are also determinative. Specifically, *who* or *what* entity owned the Policy changed over time (at various points, Koresko and his cohorts told Defendant that the Policies were owned by—FUNB, CTC, PPT, and the Single Employer Trust), as did *who* or *what* had the authority to make changes to the Policies (those who claimed authority included CTC, PPT and Koresko) and to *what* extent of authority they represented themselves to have. Further, when Defendant learned of *who* or *what* had *what* authority with respect to the Policies is unclear from the record.

## II.   STANDARD OF REVIEW

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)). A factual dispute is material where it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington*

---

[3] *See Perez v. Koresko*, 86 F. Supp.3d 293, 300, 348-49 (E.D. Pa. 2015), *aff'd sub nom. Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016).

*Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  Then, the non-moving party must "go beyond the pleadings" and "designate

'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  Courts must "view the

facts and draw reasonable inferences 'in the light most favorable to the party opposing the

[summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original)

(internal citation omitted).

### III.    DICUSSION

#### a.   Plaintiffs' ERISA Claims

Plaintiffs raise claims under two sections of ERISA—Section 1132(a)(2), which provides

for plaintiffs to obtain equitable relief and to recover damages from *fiduciaries* who breach their

duties, *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007), and Section 1132(a)(3),

which "authorize[s] suits against *any other person* who knowingly participates in a fiduciary's

violations of her duties."  *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 90 (3d Cir. 2012) (internal

citations, quotation marks and alterations omitted) (emphasis added).

##### i.   Plaintiffs' Section 1132(a)(2) Claim

Congress enacted ERISA "to ensure the proper administration of pension and welfare

plans, both during the years of the employee's active service and in his or her retirement

years." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997).  Crafted to bring order and accountability to

a system of employee benefit plans plagued by mismanagement and abuse, *Massachusetts v.*

*Morash*, 490 U.S. 107, 112 (1989), ERISA is principally concerned with protecting the financial

security of plan participants and beneficiaries.  29 U.S.C. § 1001(b); *Boggs*, 520 U.S. at 845;

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  Because of this remedial purpose, ERISA "should be liberally construed in favor of protecting the participants in employee benefit plans." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

A pertinent illustration of ERISA's broad construction is that the term "fiduciary" is defined "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan . . . thus expanding the universe of persons subject to fiduciary duties—and to damages. . . ." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original) (internal citation omitted); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013) ("The definition of a fiduciary under ERISA is to be broadly construed.").  An entity is a fiduciary for purposes of ERISA if it is either named as such in the plan, or, as relevant here, if it exercises any "authority or control respecting management [of the plan] or disposition of [the plan's] assets." 29 U.S.C. § 1002(21)(A); *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 221 (3d Cir. 2003).

A party will be found to be a fiduciary for exercising authority or control if it exercised "*undirected* authority and control" over plan assets—meaning that it did not act at the direction of a person or entity authorized to give such direction. *Srein*, 323 F.3d at 221-22 (emphasis added).  "[M]ere custody or possession over plan assets, without more," is not enough to give rise to fiduciary status. *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004).  In determining whether an entity is a fiduciary, it is crucial to keep in mind that it "is not an all or nothing concept. . . .  [A] court must ask whether a person is a fiduciary with respect to the *particular activity* in question." *Srein*, 323 F.3d at 221 (emphasis added) (alteration in original) (quoting *Maniace v. Com. Bank of Kan. City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994)).  Thus, Defendant may be a fiduciary for one of the alleged acts of discretionary authority or control but

7

lack fiduciary status for another.

Plaintiffs here contend that Defendant exercised undirected authority over the Policy on two occasions: when it issued a loan on the Lincoln Policy in 2009 and when it changed the owner of the Policy in 2010.  On each of these occasions, Plaintiffs contend that Defendant acted in a fiduciary capacity.  As threshold matters, Defendant argues that (1) Plaintiffs' claims are time-barred; (2) its actions were ministerial and thereby cannot give rise to fiduciary responsibility; and, (3) its actions were not the proximate cause of Plaintiffs' injuries.

### 1.   Statute of Limitations

Defendant's first argument that it contends estops any further inquiry and requires entry of summary judgment in its favor is that Plaintiffs' ERISA claims are time-barred.  ERISA's statute of limitations provides that an action pertaining to a fiduciary's breach must be brought by the earlier of: (1) six years after the "date of the last action which constituted a part of the breach," or in the case of an omission, "the latest date on which the fiduciary could have cured the breach or violation"; or, (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113.  These limitations apply except in cases of "fraud or concealment" in which case an action may be commenced not later than six years after the discovery of the breach or violation.  *Id.*

In support of its position, Defendant maintains that the Koreskos and Yacko were Plaintiffs' agents under California and Pennsylvania insurance law and that their knowledge can be imputed to Plaintiffs.  Although both Parties cite to California and Pennsylvania law, neither has provided the Court with a choice of law analysis to determine which of the two state's laws is applicable to the case at hand.  In that the Koreskos, knew of the loan in 2009 or 2010 at the

latest—more than three years before the instant suit was filed on September 18, 2015—
Defendant argues that Plaintiffs' ERISA claims are time-barred.

Plaintiffs fiercely dispute that the Koreskos and Yacko were their agents.  They argue
that under the common law of agency, the Koreskos were *Defendant's*—not Plaintiffs'—agents.
In support of their position, Plaintiffs cite to two decisions by the Third Circuit, one assessing
agency-relationships under RICO, *Petro-Tech, Inc. v. W. Co. of N. Am.*, 824 F.2d 1349 (3d Cir.
1987), and the other assessing agency-relationships under the Lanham Act, *Am. Tel.& Tel. Co. v.
Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

Neither Party, however, makes much effort to articulate the reasoning behind the
authorities they cite, apply such reasoning to the facts of this case, or explain why their
authorities—and not those of their opponent's—ought to control under ERISA.  Instead, each
Party argues past the other insisting—without cogent analysis—that they are right, and their
opponent is wrong.  Without some argument as to which law—be it California insurance law,
Pennsylvania insurance law, or "federal common law" regarding agency—ought to govern the
determination as to whether, and if so, with whom the Koreskos and Yacko had an agency
relationship under ERISA, or how cases interpreting the Lanham Act and RICO might bear on
this determination, the Court cannot evaluate whether the Koreskos and Yacko were Plaintiffs'
agents, whether their knowledge ought to be imputed to Plaintiffs, and, thus, whether Plaintiffs'
ERISA claims should be time-barred.  In short, "the Court's role in deciding [a] motion is not to
engage in a scavenger hunt or litigate [a Party's] case."  *See, e.g.*, *Berridge v. Nalco Co.*, 2013
WL 3216143, at *5 (D.N.J. June 25, 2013).

But even a scan of the horizon reveals a concern that would preclude summary judgment
on Defendant's agency and untimeliness argument.  Defendant did not cite any authority in

support of its assertion that under ERISA, the knowledge of agents can be imputed to their

principals.  Indeed, Defendant's argument appears at odds with the high standard of "actual

knowledge" required to start running the clock under ERISA.  As the Third Circuit has

explained, "'actual knowledge of a breach or violation' requires that a plaintiff have actual

knowledge of all material facts necessary to understand that some claim exists, which facts could

include necessary opinions of expert, knowledge of a transaction's harmful consequences, or

even actual harm."  *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) (internal citations

and quotation marks omitted).  Defendant does not explain how the knowledge of a third-party—

which third-party is disputedly the victim's agent but is undisputedly connected to the victim's

harm—satisfies this demanding standard.

As Defendant did not argue their statute of limitations defense "in a manner that permits

the court to consider its merits," it has failed to demonstrate that Plaintiffs' ERISA claims are

time-barred.  *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010).

## 2.   Ministerial Acts

Defendant next argues that it cannot be an ERISA fiduciary because their processing of

the loan and change of ownership requests were "purely ministerial" in that these actions were

done at the request of another—whom Defendant argues was authorized to take these actions

under the terms of the Policies.  As explained in this Court's decision in *Corman v. Nationwide

Life Ins. Co.*, 2022 WL 2952219, at *5-6 (E.D. Pa. July 27, 2022), Defendant's position that the

importance of the task—not whether a change was made at the direction of an authorized

person—is what determines whether a non-fiduciary can be held as a fiduciary in its execution is

not correct.[4]

---

[4] In their reply brief, Defendant also contends that mistaken reliance on Koresko's authority would not transform
their ministerial acts into acts of discretionary authority or control.  In support of their argument, Defendant cites

A non-fiduciary acting at the direction of an authorized person, regardless of the importance of that act, presents a situation distinct from one where it acts for a stranger.  *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 334 F. Supp.3d 665, 673-74 (E.D. Pa. 2018) (citing *Srein*, 323 F.3d at 221).  When a non-fiduciary has no discretion under a policy or plan document and acts at the behest of a person authorized under said document, it does not become a fiduciary with respect to that authorized person's decisions.  *Id.* at 674.  In contrast, where a non-fiduciary acts at the request of a stranger to the plan's assets, it may be found to have exercised "undirected authority or control" over those assets.  *See id.*; *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp.3d 530, 545 (E.D. Pa. 2019).  This is so even where the plan or policy document expressly provides that the non-fiduciary lacks discretion.  That is because the execution of the stranger's request is made "*in defiance*" of that document's strictures.  *Corman*, 396 F. Supp.3d at 545 (emphasis in original); *see also Srein*, 323 F.3d at 221 (holding that defendant was a fiduciary when it paid funds from a plan's investments to a stranger, though the plan documents provided that the defendant did not have any discretion with respect to investments); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 899 F. Supp.2d 310, 323-25 (E.D. Pa.

---

three non-binding decisions, none of which stands for a proposition as broad as Defendant would have it.  Each of these cases distinguish between "clerical errors" and other kinds of mistakes which suggest a misjudgment that transforms a non-fiduciary into a fiduciary.  Clerical errors include typing "an erroneous code onto a computer screen," *IT Corp. v. Gen Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997), making a mistake when mailing a check, *id.*, and miscalculating benefits owed to a plan participant according to a detailed formula set by the terms of the plan.  *See Morris v. Aetna Life Ins. Co.*, 2021 WL 509553, at *3 (C.D. Cal. Aug. 9, 2021).  An error of judgment which can give rise to fiduciary status, on the other hand, includes an overpayment of plan funds to an individual not entitled to those funds, because the very payment of those funds constitutes "an exercise [of] control over and dispos[al] of Plan assets."  *Id.* (internal quotation marks omitted) (quoting *Yeseta v. Baima*, 837 F.2d 380, 385-86 (9th Cir. 1988)).  Defendant's third case, *Schmelzer v. Huntington Bancshares Financial Corporation*, is in accord with this distinction and this Court's reasoning.  In *Schmelzer*, the District Court for the Southern District of Ohio dismissed a complaint alleging that a bank breached its fiduciary duties under ERISA by failing to withhold amounts owed by a plan participant when the bank paid that debtor-participant's accrued benefits under the plan.  2017 WL 2807469, at *6-7 (S.D. Ohio June 29, 2017).  The *Schmelzer* court explained that the complaint "contain[ed] no allegations indicating that [the bank] distributed the funds" without the instruction of an authorized individual, and declined to write such allegations into the complaint.  *Id.*  Schmelzer then attempted to characterize "the payment of [the debtor's] claims" as an "illegal loan" but the court declined to construe the payments of benefits as such.  *Id.* The *Schmelzer* court's reasoning, however, suggests that an "illegal loan" made at the behest of an unauthorized person could give rise to fiduciary status and liability under ERISA.

2012) (holding that the "performance of administrative and ministerial tasks by a mere custodian of plan assets does not amount to practical control" where the tasks "do[] not violate" the terms of the plan), *aff'd*, 725 F.3d 406 (3d Cir. 2013).

Therefore, if Defendant is found to have issued the loan on the Lincoln Policy or changed the ownership of the Policies at the request of someone who did not have authority to take such acts, it will be deemed a fiduciary with respect to those actions.

### 3. Causation

Defendant also argues that Plaintiffs' ERISA claims must fail with respect to the policy loan because the "issuance of the loan check to the Policy's Owner did not itself cause Plaintiffs' alleged injuries. Rather, they say, John Koresko's conversion of the loan proceeds after the fact was the cause and 'stands between [Lincoln's] conduct and [Plaintiffs'] injuries.'"[5] While "ERISA [does] require[] a plaintiff to show that the injury was a proximate cause of the breach of duty," *Edmonson*, 725 F.3d at 424 (citing *Willett v. Blue Cross & Blue Shield of Ala.*, 953, F.2d 1335, 1343 (11th Cir. 1992)), Defendant's argument nonetheless fails as it does not address the key thrust of Plaintiffs' claim—that the loan was *not* issued to the rightful owner of the Policy. Plaintiffs argue that Defendant issued a loan which was unauthorized by the owner, and then sent the proceeds to Penn-Mont—which was *not* the Policy owner. Plaintiffs contend that absent Defendant's actions, Koresko would not have been able to convert the Policy funds: had Defendant not done so, Plaintiffs would not have suffered injury. Under the standard of proximate cause under ERISA, this causal chain is enough as Plaintiffs' loss is "causal[ly]

---

[5] Notably, Defendant does not argue that their actions were not the proximate cause of Plaintiffs' ERISA claims stemming from the change of ownership of the Policy. Accordingly, Defendant's causation argument is not considered as to this claim. *See Shell Petrol., Inc v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) (a litigant "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits. . . .").

connect[ed]" and "resulted" from Defendant's issuance of the unauthorized loan.  *See Willett*, 953 F.2d at 1343.

### 4.   Issuance of the Loan on the Policy

Having dispersed with the threshold issues raised by Defendant, consideration turns to Plaintiffs' first theory of fiduciary responsibility, which arises from Defendant's issuance of a loan on the Lincoln Policy in 2009.  The pertinent facts are as follows: prior to the loan request, the owner of the Greils Policy was thrice changed: first, the trustee was changed from FUNB to CTC in 2002; second in 2005, the trust which owned the Policy was changed from the REALVEBA Trust to the "Howard Greils, M.D., Inc. Welfare Plan Trust" which was noted as "part of the SINGLE EMPLOYER TRUST;" and third, the trust was again changed to the "Individual Single Employer Welfare Plan, [CTC], Trustee"   In July 2009, Koresko requested a "maximum loan available" on the Greils Policy.  The request listed the owner of the Policy as the "Single Employer Welfare Plan Trust, CTC Trustee" and was signed by Koresko. Accompanying Koresko's signature was a note which represented that he was signing as "Signator, CTC Trustee Pres/Atty in Fact."  Koresko also submitted an Employee Participation Agreement to support the loan application.  The Employee Participation Agreement appointed John Koresko, among others, as Greils' "Limited Attorney in Fact with respect to all matters connected with and/or related to the procurement and maintenance of benefits payable to [Greils] pursuant to the HEALTH AND WELFARE BENEFIT PLAN."  Based on these submissions, Defendant issued $784,848.61 to "IND SINGLE EMPLOYER WELFARE PLAN, ATT COMMUNITY TRUST CO TTEE, C/O PENN-MONT BEN SRVCS INC, 200 W 4TH ST, BRIDGEPORT, PA 19405."

Plaintiffs argue that these documents did not demonstrate that Koresko had the authority

to sign on behalf of CTC and take out the loan on the Policy because the Employee Participation Agreement granted Koresko limited power attorney over Greils in an individual capacity and did not appoint him as a limited attorney in fact for the owner of record—the Single Employer Trust. Plaintiffs further contend that at the time of the loan request F&M—not CTC—was the trustee of the Policy, as it succeeded CTC following a merger.  Plaintiffs also contend that under Lincoln's internal loan procedures, Koresko's request would have been "insufficiently authorized" and should not have been processed.

In response, Defendant disputes every point raised by Plaintiffs.  It argues that the application and Employee Participation Agreement demonstrate that Koresko was an authorized representative of the trustee of the Lincoln Policy, which they contend was CTC.  Defendant does not address Plaintiffs' argument that F&M and not CTC served as the trustee of the Policy. Defendant further argues that the internal loan procedures functioned as "guidelines only," which were "substantially complied with."  It further disputes that the Employee Participation Agreement was executed by Greils in his individual capacity only and represent the Agreement as endowing Koresko with power of attorney over both Plaintiffs and making Koresko an authorized representative of the Policy Owner.

Whether the loan was properly authorized depends on the interpretation of the Employment Participation Agreement, the import of Defendant's guidelines and the identity of the trustee at the time of the loan issuance—each of which the Parties dispute.  Each of these issues presents a dispute of material fact, the resolution of which cannot be completed at summary judgment and falls to the fact finder.

Defendant alternatively argues that "CTC/Penn-Mont/Koresko" had apparent authority to take out a loan on the Policy based on the Employee Participation Agreement and "a history of

14

dealings with the Policy."  Defendant's argument, however, stumbles at every step.

Critically, Defendant has not identified the "history of dealings" which it claims provided "Koresko/Penn-Mont/CTC" with apparent authority for the Lincoln loan.  Though it suggests the existence of an extensive set of interactions beyond those related to the loan, it references only two such interactions in their brief: the first pertains to the documentation submitted to obtain the Policy on Greils' life—which included the application for the policy, an "Acknowledgement," and the Policy Contract—and, the second relates to the documentation submitted to support the Policy loan.  At summary judgment, a party must support its assertions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A); it cannot carry its burden by leaving the court to guess at the facts or do its job of "identify[ing] with reasonable particularity the evidence upon which [the party] relies." *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  As it stands, this Court has not been introduced by Defendant's citations to the record concerning the "history of dealings" to which it refers in its brief.

Further, Defendant has provided no citation in support of its legal argument that Koresko/Penn-Mont/CTC all held apparent authority, other than fleeting reference to two non-binding decisions published in 1979 and 1986, neither of which pertain to ERISA and both of which apply Pennsylvania law on agency.  *Lincoln Bank v. Nat'l Life Ins. Co.*, 476 F. Supp. 1118, 1121 (E.D. Pa. 1979) (considering two creditors' competing claims to the cash surrender value of an insurance policy); *Mires v. Evans*, 1986 WL 8117, at *10-11 (E.D. Pa. July 21, 1986) (considering a veterinary malpractice claim).  Clouding its use of these two cases lurks the Parties' failure to analyze anywhere whether Pennsylvania or California law applies.  The Court will not—absent more—simply rely on the parties' representation that things fall out the same under either state's law.

In short, Defendant has not presented their apparent authority defense "in a manner that permits the court to consider its merits," as it has neither articulated the facts, nor identified the applicable law, nor applied that law to those facts. *Dupree*, 617 F.3d at 728. It has thus failed to demonstrate that "Koresko/Penn-Mont/CTC" had apparent authority to take out a loan on the Lincoln Policy.

### 5. The Change of Ownership of the Policy

Plaintiffs' second theory of fiduciary breach arises from a change in the ownership of the Policy in 2010. It is undisputed that on April 27, 2010, Larry Townsend of Penn-Mont requested that Lincoln change the owner of 41 policies held by Lincoln. The request form sought to change the trustee from CTC to PPT. John Koresko signed the change of ownership form as "Director, CTC Trustee" on behalf of the former owner, and as "Director, [PPT], Trustee," on behalf of the new owner. Also appended to the ownership requests was a "Trust Asset Ownership and Privacy Notice" which explained that PPT was the trustee for the REAL VEBA and Single Employer Trusts by court order—a copy of which order was also provided—and that "PPT had obtained permission from the Commonwealth of Pennsylvania to use the trade name 'CTC Trustee.'" In response, Defendant requested a copy of the plan, a statement signed and dated by trustee confirming the name of the trust, and a statement that Koresko was the sole officer of PPT before it transferred ownership of the Policy to PPT. Defendant did not receive these documents and did not make this change.

In early November 2010, Larry Townsend of Penn-Mont sent a letter which renewed the change of ownership request. In response, Defendant advised Townsend that it had not received the documentation it had previously requested and required this documentation and a new change in ownership request form before it could process the request. In early December 2010,

Defendant submitted a new request form and an affidavit by Koresko which stated that he was the sole director of PPT and that the correct name of the trust was the "Single Employer Welfare Benefit Plan Trust."  The record does not indicate that Koresko provided Defendant with a copy of the HG Plan, despite being requested to do so.  The change in ownership request was processed thereafter.

Plaintiffs argue that Koresko did not have authority to act on behalf of CTC because it no longer existed—one of the arguments they advanced regarding the impropriety of the Lincoln policy loan.  Because CTC did not exist, Plaintiffs argue that Koresko could not submit a change of ownership form on behalf of CTC to transfer ownership to PPT.[6]  Defendant, like Plaintiffs, rely on their arguments advanced for the propriety of the loan issuance to contend that Koresko had authority to act on behalf of the trustee, CTC, and thus had the authority to request that the ownership of the Policy be changed.

But as previously explained, it is disputed as to whether the documentation supplied for the Policy loan authorized Koresko to act on behalf of the owner of the Lincoln Policy.  Because both Parties rely on a determination regarding the propriety of the Policy loan to conclude that Koresko was or was not authorized to change the ownership and that issue is in dispute, summary judgment shall be denied on the Section 1132(a)(2) claim.

### 6.  Section 1132(a)(3) Claim

Turning next to Plaintiffs' claim of non-fiduciary liability pursuant to Section 1132(a)(3) of ERISA—on which both Parties have filed competing Motions for Summary Judgment—this

---

[6] Plaintiffs also contend that the court order accompanying the first request does not indicate that PPT was the rightful owner of the Policy, because the court order pertained to the REAL VEBA and Single Employer Trusts. Plaintiffs contend that the Policy "was not then and had never been owned by those trusts.  It was owned by the HG [Plan]."  The record and Plaintiffs' brief, however, indicates that the owner of the Policy was not the HG Plan but was instead the "Individual Single Employer Welfare Plan."

provision authorizes a "participant, beneficiary, or fiduciary of a plan to bring a civil action" against *any person*, including non-fiduciaries, "to obtain appropriate equitable relief to redress violations of ERISA Title I." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (internal citations and quotation marks omitted) ["*Harris Trust*"]. Section 1132(a)(3) has been interpreted to be a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (internal quotation marks omitted).

Two key elements must be met before liability is imposed on a non-fiduciary pursuant to this Section. First, there must be a plan fiduciary who had "actual or constructive knowledge of the facts satisfying the elements of a [prohibited] transaction, [and] caused the plan to engage in the [unlawful] transaction" and, second, the non-fiduciary must have "had actual or constructive knowledge of the circumstances that rendered the [fiduciary's] transaction unlawful." *Harris Trust*, 530 U.S. at 251. In sum, there must be two actors, a fiduciary and a non-fiduciary, the latter of whom had constructive knowledge of the circumstances rendering the transaction unlawful before it can be held liable under Section 1132(a)(3). In the instant case, Plaintiffs posit that Defendant is liable under Section 1132(a)(3) because it "knowingly participate[d] in a prohibited transaction." Defendant counters that Plaintiffs' Section 1132(a)(3) claim must fail because they have neither adduced evidence which demonstrate that it knew of Koresko's fiduciary breaches, nor have they demonstrated that it participated in any prohibited transactions.

Plaintiffs respond to the latter argument by stating that Defendant's position "is just a repeat of its claim that the transactions were authorized or permissible." They otherwise make no effort to explain the prohibited transaction in which they claim Defendant participated—be it

the payment of commissions, the issuance of the loan, or both—nor do they rebut Defendant's

argument that it did not participate in said transaction.  To be clear, not every transaction is a

"prohibited transaction" under ERISA; rather, these transactions are enumerated under 29 U.S.C.

§ 1106.  A prohibited transaction requires proof of several elements, for example: (1) a fiduciary;

(2) a "party in interest"; and, (3) the act of the transaction itself, for example, the "lending of

money or other extension of credit" between the fiduciary and party in interest or the "transfer to

. . . a party in interest . . . of any assets of the plan."  29 U.S.C. § 1106(a)(1).

      Given that Plaintiffs do not identify the "prohibited transaction" in which they claim

Defendant engaged, do not cite the provision of Section 1106 under which they claim it falls, or

explain how the transaction satisfied the elements of any such prohibited transaction,

Defendant's Motion for Summary Judgment on their Section 1132(a)(3) claim shall accordingly

be granted.

### b.  Plaintiffs' RICO Claims

      Plaintiffs raise three RICO claims—two of which are brought pursuant to Section

1962(c), 18 U.S.C. § 1962(c), and the third of which is brought under Section 1962(d).

18 U.S.C. § 1962(d).  None of these claims survives summary judgment.

      Turning first to Plaintiffs' Section 1962(c) claims:  one is premised on Defendant's direct

liability for a RICO violation, and the others are for vicarious liability for the actions of the two

Koresko brothers and their various companies.  Section 1962(c) makes it unlawful for "any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. §

1962(c).  To maintain a claim for liability under Section 1962(c), Plaintiffs must demonstrate

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (internal citations and quotation marks omitted).

The Section 1962(c) direct liability claim fails at the first element—conduct.  That is because Plaintiffs have not demonstrated that Defendant took "some part in directing the enterprise's affairs" which is necessary for a finding that it "conduct[ed] or participate[d]" in the conduct of an enterprise under Section 1962(c).  *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993).  Direction can extend to the "lower rung participants" and "outsiders" in the enterprise so long as they "exert control over [the enterprise]" and "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Id.* at 184-85 (emphasis in original). Services or goods provided by a third-party to the enterprise do not satisfy this requirement, regardless of how indispensable or valuable the service may have been, because they do not demonstrate that the defendant had "knowingly engage[d] in '*directing* the enterprise's affairs.'" *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) (emphasis in original) (internal citations omitted).  In sum, "[i]t cannot be said that by merely performing what are generic financial and related services . . . even if they are later found to be deficient, [a] [] firm has opened itself to liability under the federal racketeering statute."  *Id.* at 1539-40.  Indeed, there is consensus that Section 1962(c) claims against outside professionals providing important services to a racketeering enterprise do not constitute claims that these professions directed the affairs of the enterprise.  *See, e.g.*, *Azrielli v. Cohen L. Offs.*, 21 F.3d 512, 521-22 (2d Cir. 1994) (provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise conducting the fraudulent transaction); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F. Supp. 257, 260 (E.D. Pa. 1993) (holding that

even if appraiser's reports are "keystone" of the enterprise's perpetration of fraud, appraiser cannot be liable under Section 1962(c)); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994) (accountants were not liable because their involvement in enterprise's decision did not arise to direction because they neither made those decisions nor carried them out); *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (providing legal services to an enterprise did not satisfy "operation or management" test); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) (sales representative did not participate in "operation or management" of the enterprise).

Plaintiffs contend that Defendant was "the provider[s] of the product the enterprise was designed to sell . . . collaborator[s] and partner[s] in the marketing scheme; in receiving premiums, paying commissions and administering the insurance policies sold, [they] played a substantial role in the continued administration of the enterprise; and, in approving or rejecting loan requests, [they] played a pivotal role in the conversions. . . ."  Plaintiffs also posit that Defendant's role went beyond merely issuing the Policy because the plan documents incorporate the terms of the Policy, under which Defendant had "ultimate control over whether and how death benefits are to be paid and the amount of the benefits."  Though Plaintiffs use a variety of verbs to describe what Defendant did, they do not point to competent evidence that Defendant *directed* or exercised control regarding the *enterprise's* affairs.  Even assuming that Defendant acted as Plaintiffs say they did—which Defendant disputes—these actions are more akin to a service provider whose support, though integral to the enterprise, does not provide the basis for RICO liability.  Defendant's Motion for Summary Judgment on Plaintiffs' Section 1962(c) direct liability claim shall therefore be granted.

Plaintiffs' theory of vicarious liability under Section 1962(c)—premised on an argument that the Koreskos and their companies were Defendant's agents in selling its insurance

products—fares no better.  Defendant argues that vicarious liability is not a viable claim under

Section 1962(c).  As this Court explained in depth in its recent decision in *Corman*, 2022 WL

2952219, at *12-13, Defendant is correct.  The text of Section 1962(c) does not support a private

civil cause of action under a theory of vicarious liability, which dooms Plaintiffs' Section

1962(c) vicarious liability claim as a matter of law.  Defendant's Motion for Summary Judgment

on this claim shall therefore be granted.

Plaintiffs' RICO Section 1962(d) claim likewise does not survive.  Defendant cites to

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993), which states that "any

claim under section 1962(d) based on a conspiracy to violate the other subsections of section

1962 necessarily must fail if the substantive claims are themselves deficient."  Ergo, as Plaintiffs

substantive Section 1962(c) claims have been dismissed, so too must their Section 1962(d) claim

be dismissed.

### c.  Plaintiffs' Common Law Claims

Defendant also move for summary judgment on all of Plaintiffs' common law claims.

Plaintiffs do not specify in their First Amended Complaint whether these claims are brought

under California or Pennsylvania common law.  Defendant's Motion for Summary Judgment

notes this ambiguity and applies the laws of both states.  In their opposition brief, Plaintiffs do

not clarify which state's laws govern their claims, and also cite to the jurisprudence of both

states.  Although Defendant contends that "the Court need not decide which state's laws

apply[,]" as demonstrated by the Parties' briefs, California and Pennsylvania approach these

claims differently, with different statutes of limitations, different burdens of proof, different

requisite elements, and separate duties and statutes which bear on many of the claims asserted by

Plaintiffs.  This Court cannot determine whether to enter judgment as a matter of law in

Defendant's favor when it has no basis for determining which state's law applies and, thus, Defendant's Motion will be denied on each of the common law claims.

## IV.   CONCLUSION[7]

For the foregoing reasons, Defendant's Motion shall be granted with respect to Plaintiffs' ERISA Section 1132(a)(3) claim, and Plaintiffs' RICO claims.  The Parties cross-motions shall be denied in all other respects.

An appropriate order follows.

BY THE COURT:

/S/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.

---

[7] Defendant also contends that it is "entitled as a matter of law to setoff [Plaintiffs'] prior recoveries" and seeks an order at summary judgment setting off any damages Plaintiffs may recover for their surviving claims. Though Defendant cites several cases in support of its claim for setoff, nearly all of these decisions were reached *after* trial or in consideration of a settlement agreement.  Of these cases, only one non-binding decision by the District of Utah considered whether a defendant was entitled at summary judgment to set-off its potential damages.  *See, e.g.*, *State Farm Mut. Auto. Ins. v. Lincow*, 30 F. Supp. 3d 368, 372 (E.D. Pa. 2014) (post-trial motion for mark judgment satisfied); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 428 (3d Cir. 1993) (appeal of post-trial entry of remittitur and judgment as a matter of law); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2007) (appeal of post-settlement Fed. R. Civ. P. 60(b) Motion for Relief from Judgment); *Chisolm v. UHP Projects, Inc.*, 205 F.3d 731, 733-34 (4th Cir. 2000) (appeal of decisions on post-trial motions); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 717, 732 (E.D. Pa. 2001) (noting that non-settling defendants could be entitled to set-off of "any judgment plaintiffs obtain against them" on Motion for class-wide settlement because such a set-off was undisputed and provided for in the settlement agreement); *In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1030 (3d Cir. 1992) (appeal of approval of class action settlement); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 559-60 (S.D. Tex. 2005) (considering effect of set-off on motion for class-wide settlement); *but see David P. Coldesina, D.D.S., P.C. Emp. Profit Sharing Plan Tr. v. Est. of Simper*, 2006 WL 1702632, at *5 (D. Utah June 16, 2006) (considering whether one Defendant was permitted to set-off the settlement award paid by another defendant at summary judgment).  This Court thus declines Defendant's request for an opinion determining its potential liability if Plaintiffs were to succeed on their remaining claims.